IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2019

## LONNIE LEE ANGEL, JR. v. STATE OF TENNESSEE

Appeal from the Circuit Court for Bledsoe County
No. 2016-CR-2     Thomas W. Graham, Judge

_____

### No. E2018-01551-CCA-R3-PC

_____

The Petitioner, Lonnie Lee Angel, Jr., appeals the Bledsoe County Circuit Court's denial of his petition for post-conviction relief from his 2011 conviction for second degree murder and his twenty-three-year sentence. The Petitioner contends that (1) he received the ineffective assistance of trial counsel and (2) the post-conviction court erred by prohibiting him from compelling the attendance of witnesses by subpoenas at the evidentiary hearing. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JR., JJ., joined.

Gerald L. Gulley, Jr. (on appeal), Knoxville, Tennessee, and Randy Clark (at post-conviction hearing), Pikeville, Tennessee, for the appellant, Lonnie Lee Angel, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine Redding, Assistant Attorney General; Mike Taylor, District Attorney General; and James W. Pope III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner's conviction relates to the February 2009 beating death of Donnie L. Lawson. This court affirmed the Petitioner's conviction and summarized the facts of the case as follows:

On February 21, 2009, the defendant hosted a cookout inside the barn at his residence in Bledsoe County. The victim came to the cookout with the defendant's father, Lonnie Lee Angel, Sr., who passed out in his truck shortly after arriving at the fete due to his having consumed a significant amount of

alcohol and several prescription medications. At some point, an argument erupted over the details of the death of Clyde Angel, the defendant's uncle who had died in a house fire. One of the attendees, Preston Parker, who was a "fourth cousin or something" to the defendant, became so enraged when the victim implied that he might have had a hand in Clyde Angel's death that he "grabbed [the victim], and jerked him down, and . . . hit him . . . as he went down, and . . . kicked him a few times" in the head as he lay on the ground. Because he believed the victim to be "a pretty rough feller" who had "whooped two or three, shot one or two," Mr. Parker struck the victim again as the victim attempted to regain his feet.

Following this initial beating of the victim, the six-foot-seven-inch, 350-pound defendant declared that no one would be permitted to leave the residence. Mr. Parker ordered the four children who were present, Mr. Parker's nephew and son and the defendant's sons, back to the defendant's mobile home.

After approximately 15 minutes, the defendant allowed Virgil "Tiny" Eller to leave after Mr. Eller convinced the defendant that he needed to pick up his girlfriend. Shortly thereafter, Ray Tullos and Mark Sherman arrived, and Mr. Parker relayed to the men "what went on." Mr. Tullos, indignant at the victim's implication regarding the death of Clyde Angel, attacked the unconscious victim, striking him with a "big beer bottle," "a pair of boots," and a post driver. Later, Mr. Tullos boasted to Mr. Parker that he had urinated on the victim. Mr. Sherman recalled that when he and Mr. Tullos arrived, the victim lay on the ground, unconscious and bleeding from several wounds on his face. Mr. Sherman told the defendant that the victim needed medical attention, and the defendant responded, "Preston, that's enough. The man's in a coma now."

Following the savage attack, the men began to discuss what should be done with the victim, and one of the men suggested "[h]auling [the victim] off to the rock crusher" while the defendant aimed a gun at the victim and threatened to shoot him. Before any action could be taken, Mr. Angel, Sr., awoke and demanded to know what had transpired. Mr. Angel, Sr., told the men that the victim had played no role in Clyde Angel's death and ordered the men to leave the victim alone. Mr. Angel, Sr., asked to leave, and although he had initially refused to allow anyone to leave, the defendant eventually asked Mr. Sherman to drive Mr. Angel, Sr., home.

Both Mr. Parker and his 12-year-old nephew, D.P., testified that the defendant struck or kicked the victim more than one time. Mr. Parker and

D.P. each testified that the defendant aimed a gun at the victim and threatened to kill him. Mr. Sherman testified that another attendee, Allen Watson, rather than the defendant, threatened to shoot the victim. P.J.P., Mr. Parker's son, testified that he did not see the defendant hit or strike the victim.

Mr. Angel, Sr., telephoned 9-1-1 at 9:30 p.m. and asked that an ambulance be sent to the defendant's residence because the victim had been beaten "to death."

When the ambulance arrived, the victim was barely alive. The victim was "unresponsive" and "[b]arely breathing." His face was swollen and covered in dried blood, and his eyes were "swollen shut." He had a "[l]arge knot on the backside of his head where it appeared he was hit with something" and "a lot of bruising on his chest and on his side." Weather conditions thwarted attempts to arrange air transport for the victim, and the victim was transported by ambulance to the hospital, where he was pronounced dead at 11:00 p.m.

An autopsy established that the victim had died as a result of multiple blunt force injuries to his head. The victim suffered multiple head injuries, including a number of abrasions and lacerations, two black eyes, and a broken jaw. The victim also suffered bleeding beneath his scalp and around his brain. As a result of the multiple blunt force injuries inflicted on his head, the victim's brain swelled, putting pressure on the "vital structures of the brain that control" breathing and heart rate, which eventually led to the victim's death.

Forensic testing confirmed the presence of the victim's blood on a boot found in the bed of the defendant's truck, on a post driver found in the defendant's barn, on a beer bottle found in the defendant's barn, and on the legs of the defendant's blue jeans. Blood found on the front left pocket area of the defendant's blue jeans "was consistent with a DNA mixture" of the defendant and the victim. A short-sleeved gray t-shirt recovered from the defendant's house had two blood stains, one with a DNA profile that belonged to the victim and one that contained a mixture of DNA from the victim, the defendant, and an unknown minor contributor.

The trial court granted the defendant's motion for a judgment of acquittal on the counts charging the defendant with aggravated kidnapping and felony murder in the perpetration of kidnapping, and the jury acquitted the

-3-

defendant of first degree premeditated murder but convicted him of the lesser included offense of second degree murder. Following a sentencing hearing, the trial court imposed a sentence of 23 years' incarceration.

*State v. Lonnie Lee Angel, Jr.*, No. E2014-00732-CCA-R3-CD, 2015 WL 2393972, at *1-2 (Tenn. Crim. App. May 18, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015).

The Petitioner filed the instant petition for post-conviction relief, alleging, in relevant part, that trial counsel engaged in multiple instances of ineffective assistance, that newly discovered evidence warranted a new trial, and that the cumulative effect of the errors warranted relief.

At the post-conviction hearing, trial counsel testified that he had been a licensed attorney for forty-four years. He said that he represented the Petitioner in the trial court proceedings but gave his file to appellate counsel after the Petitioner was convicted. Counsel said that he was hired after the preliminary hearing and that although he knew previous counsel had filed motions, he did not recall which motions. Counsel also did not recall which motions he filed.

Trial counsel testified that he "made . . . several trips around to interview witnesses," which included Mr. Eldridge and Ms. Faults. Counsel said that he met with the Petitioner several times at the jail and that the Petitioner provided information relative to whom counsel should interview. Although counsel did not recall the length of his and the Petitioner's meetings, he said that the meetings were "good productive conversations" and that they met approximately six times.

Trial counsel testified that he requested and received the State's discovery package. He recalled that the package contained compact discs and that the Petitioner had problems viewing them at the jail. Counsel could not recall whether the issue was "satisfactorily resolved." He said that he and the Petitioner discussed the discovery materials but that he and the Petitioner did not review the discs together. Counsel said that he did not make the technology required to view the discs available to the Petitioner. Counsel did not recall what materials were on the discs. He was unsure whether "paper copies" of the materials were provided to the defense. He said he was confident the State did not present any evidence at the trial that was not contained on the discs.

Trial counsel testified that the defense discussed whether to seek a change of venue, that he ultimately did not file the motion because it "cut both ways," and that many people knew about the offenses and the Petitioner. Counsel said that although many people in the community liked the Petitioner, others did not. Counsel did not think the trial court would

have granted a change of venue and said the Petitioner agreed with counsel's decision not to seek another venue.

Trial counsel testified that he knew the Petitioner had significant hearing loss in one ear, possibly both ears. Counsel recalled that the Petitioner had difficulty with "that one ear" and that the acoustics inside the courtroom "were a problem for everybody," including counsel, the Petitioner, and the prosecutor. Counsel was unaware of whether the Petitioner was fitted with hearing aids before the trial, but he did not think the Petitioner had hearing aids during the trial. Counsel said that the Petitioner discussed the hearing loss, especially in one ear. When asked what efforts counsel made to the ensure the Petitioner could hear, counsel said that the Petitioner "seemed to be able to hear" and that they communicated effectively. Counsel recalled a couple of incidents during the trial in which counsel had difficulty hearing witness testimony and in which the Petitioner told counsel what a witness had stated. Counsel said that he had no reason to believe the Petitioner had difficulty hearing and that if counsel had thought the Petitioner could not hear, counsel would have filed a motion for "assistance." Counsel did not recall the Petitioner's stating during the trial that the Petitioner could not hear. Counsel said that he would not dispute the Petitioner's allegation that prison personnel had denied him medical assistance before the trial related to his hearing.

Trial counsel testified that he advised the Petitioner the decision to testify belonged to the Petitioner, that counsel advised the Petitioner the State could question the Petitioner about his previous criminal convictions, and that counsel and the Petitioner agreed to wait until the State's proof had been presented before the Petitioner decided. Counsel said that he was unaware of any hearing difficulty during the trial and that the Petitioner's hearing had no bearing on counsel's advice related to whether the Petitioner should testify.

Trial counsel testified that although the Petitioner's and the victim's DNA profiles were found on the Petitioner's jeans, the evidence showed that the Petitioner tried to help the victim. Counsel said that he cross-examined codefendant Preston Parker about his prior inconsistent statements and believed that Mr. Parker had been "impeached pretty well." Counsel said that he cross-examined Mr. Parker about the State's favorable treatment in exchange for Mr. Parker's guilty plea and testimony against the Petitioner. Counsel said that the victim's sister testified that the Petitioner and the victim had a good relationship before the incident and that the Petitioner had loaned the victim money to purchase a "trailer."

Trial counsel testified that testimony from the emergency medical technician was "very neutral" and that counsel did not interview the technician before the trial. Counsel said that the Petitioner recalled having attempted to help the technician with the victim and wanted counsel to question the technician about this. Counsel recalled telling the Petitioner that the technician's testimony had not hurt the defense, that counsel had not interviewed the

technician, and that the Petitioner was "very insistent." Counsel said that he asked the technician if the Petitioner had assisted "with getting [the victim] some attention." Counsel recalled the technician's testifying that the Petitioner "kind of got in the way and almost knocked the man off the stretcher" and that the Petitioner told the technician "to get him out of here." Counsel said that this testimony was a "turning point" in the trial because it "hit the jury wrong." Counsel said that, afterward, the jurors were not "interested in a word" counsel said. Counsel said that if asking the question "was my decision to make, it was not the right one, and perhaps [the Petitioner] ought to have some relief."

Trial counsel testified that the defense did not submit any evidence for independent forensic analysis because he did not think an analysis would have yielded "constructive" results. He recalled that the evidence showed the codefendant used various items to assault the victim and that fingerprint evidence did not connect the Petitioner to the items, which included a broken beer bottle.

Trial counsel identified a letter from the Petitioner addressed to counsel and agreed that in the letter the Petitioner requested all of the discovery materials. Counsel said that the materials were provided to the Petitioner. Counsel said that although he and the Petitioner did not view the contents of the compact discs, he and the Petitioner discussed the contents. Counsel did not know whether the Petitioner saw the photograph evidence before the trial but said they discussed the photographs. Counsel did not seek to exclude any of the photographs before the trial. Counsel said that the chosen defense was that the Petitioner did not inflict the victim's injuries. Counsel said he did not question the medical examiner about the evidence showing that the victim's DNA was not found on the Petitioner's boots.

On cross-examination, trial counsel testified that previous counsel filed motions for a bill of particulars, discovery, agents to retain notes, and the production of the medical examiner's records and file. Counsel recalled that previous counsel also filed motions related to jury out hearings, production of photographs, contact information for the State's witnesses, the Defendant's pretrial statements, voir dire, the exclusion of certain testimony, and any agreements between the State and its witnesses. Counsel said he initially did not see the need to file additional motions. He said that all of the State's evidence was provided to the defense before the trial.

Trial counsel testified that the trial court granted his motion to sever the Petitioner's case from the codefendants' cases and that counsel also filed a motion for a bill of particulars and for the codefendants' and the victim's criminal records. Counsel said he objected to the victim's sister identifying a photograph of the victim and attempted to stipulate to the victim's identity. Counsel recalled that the trial court excluded some of the photographs depicting the victim's bloody head wound at the scene. Counsel said that the Petitioner was able to consult with him during the trial about the photographs.

Trial counsel testified that he and the Petitioner discussed everything contained in the discovery materials, regardless of whether the Petitioner saw the contents. Counsel agreed that the defense had copies of the autopsy report, toxicology report, preliminary hearing transcript, serology and DNA report, and firearm analysis report. Counsel agreed that the DNA inside the Petitioner's pants pockets was consistent with the Petitioner's rendering aid to the victim by clearing the victim's mouth and that this evidence was presented to the jury. Counsel agreed that the State did not present additional DNA evidence relative to the Petitioner and said that, as a result, the medical examiner could not link the Petitioner to any items used during the assault. Counsel agreed he received *Jencks* material before the trial. Counsel said that he and the Petitioner discussed everything and that the defense was prepared for the trial.

Trial counsel testified that the victim did not have the "best reputation in the area." Counsel recalled that codefendant Parker alleged the victim "had shot a few, stabbed a few, and beat up a few." Counsel stated that he cross-examined codefendant Parker about his prior inconsistent statements.

Trial counsel testified that the Petitioner did not request hearing aids during the trial. Counsel said that although the Petitioner reported having hearing problems, everyone in the courtroom had difficulty hearing during the trial. Counsel said, though, that the difficulty hearing everyone experienced did not impact the outcome of the trial. Counsel said that if the Petitioner had decided to testify at the trial, the State would have used the Petitioner's three previous convictions for impeachment purposes and questioned him about why he "made himself absent from his home for several days" after the victim's death. Counsel thought the defense presented sufficient evidence showing that the Petitioner was not involved but was in the wrong place at the wrong time.

Upon this evidence, the post-conviction court denied relief. Regarding the Petitioner's numerous ineffective assistance of trial counsel allegations, the court determined that "none[,] even if error could have been established, would have met the prejudice prong of *Strickland*." The court found that counsel did not provide deficient performance. The court made no additional findings of fact or conclusions of law. This appeal followed.

## I.      Ineffective Assistance

The Petitioner contends that trial counsel provided ineffective assistance by failing to address the Petitioner's inability to hear trial testimony, failing to cross-examine an emergency medical technician adequately, and failing to provide the Petitioner with means to review the discovery materials contained on compact discs. He likewise asserts that the

cumulative effect of counsel's deficient performance resulted in prejudice. The State responds that the post-conviction court did not err by denying relief.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A.    The Petitioner's Hearing

The Petitioner asserts that trial counsel provided ineffective assistance by failing to obtain hearing assistance at the trial. However, the Petitioner did not testify at the post-conviction hearing about the extent of his hearing impairment and his alleged inability to hear the trial court proceedings. The only evidence related to the Petitioner's hearing came from trial counsel. Although counsel knew about the Petitioner's hearing difficulties, the Petitioner "seemed to be able to hear" during the trial. Counsel said he and the Petitioner were able to communicate effectively. Counsel recalled that the courtroom acoustics were problematic for everyone during the trial and that when counsel had difficulty hearing witness testimony, the Petitioner was able to tell counsel what the testimony had been. Counsel had no reason to think the Petitioner could not hear during the trial but would have filed a motion for "assistance" if the Petitioner had mentioned an inability to hear and to understand the trial court proceedings. The record supports the post-conviction court's determination that the Petitioner failed to show counsel provided deficient performance resulting in prejudice. The Petitioner is not entitled to relief on this basis.

To the extent that the Petitioner has asserted a stand-alone due process violation based upon an inability to hear the trial court proceedings, appellate consideration of this issue has been waived because the Petitioner failed to raise it in his petition for relief and to present evidence supporting the allegation at the evidentiary hearing. *See* T.C.A. § 40-30-104(d); 40-30-106(d) (2018). Furthermore, the Petitioner failed to raise this claim in the appeal from the conviction proceedings. *See id*. § 40-30-106(g). The Petitioner is not entitled to relief on this basis.

## B.    Cross-Examination

The Petitioner asserts that trial counsel provided ineffective assistance by cross-examining the emergency medical technician about the Petitioner's assisting the victim at the scene. However, none of the thirty-two ineffective assistance allegations contained in the petition for relief involve the cross-examination of the emergency medical technician. *See id*. § 40-30-104(d);40-30-106(d).

However, trial counsel testified at the evidentiary hearing that the technician's general testimony was not favorable to any particular party but that the Petitioner insisted counsel question the technician about the Petitioner's assisting the victim at the scene. When questioned, the technician testified that the Petitioner "kind of got in the way and almost knocked the man off the stretcher" and told the technician to get the victim "out of here." Counsel considered the technician's testimony a turning point in the trial. Although the technician's testimony was unfavorable to the defense, "cross-examination is a strategic and

tactical decision of trial counsel, which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991); *see Adkins*, 911 S.W.2d at 347. The record supports the post-conviction court's determination that the Petitioner failed to show counsel provided deficient performance resulting in prejudice. The Petitioner is not entitled to relief on this basis.

## C.    Discovery Materials

The Petitioner alleges that trial counsel provided ineffective assistance by failing to show the Petitioner the discovery materials contained on the compact discs and that, as a result, he was unable to review the State's evidence against him.

The compact discs containing the discovery materials were not received as an exhibit in the post-conviction court. This court will not speculate relative to the information contained on the discs. In any event, trial counsel testified that he requested and received the State's discovery package and that although the Petitioner had difficulty viewing the materials contained on the discs, counsel and the Petitioner discussed the discovery materials. Therefore, the uncontroverted evidence reflects that counsel and the Petitioner discussed the contents of the discovery materials. Counsel likewise testified that the State did not present any evidence at the trial that was not contained in the discovery materials and that the Petitioner consulted with counsel during the trial about the photographs contained on the discs. The record supports the post-conviction court's determination that the Petitioner failed to show counsel provided deficient performance resulting in prejudice. The Petitioner is not entitled to relief on this basis.

## D.    Cumulative Error

The Petitioner asserts that multiple instances of deficient performance by trial counsel result in prejudice, requiring a new trial. The concept of cumulative error is that multiple errors, though harmless individually, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). We have determined that the record supports the post-conviction court's determination that the Petitioner failed to establish trial counsel provided deficient performance, and, as a result, multiple errors do not exist. The Petitioner is not entitled to relief on this basis.

## II.    Subpoenas

The Petitioner contends that the post-conviction court erred by prohibiting him from compelling witnesses with subpoenas to testify at the post-conviction hearing. The Petitioner argues that the court prevented him from presenting evidence related to his post-conviction allegations.

The record reflects that on April 4, 2018, twelve subpoenas were issued by the circuit court clerk. The subpoenas were addressed to Mark Sherman, Paula Peterson, Mark Dunlap, Suzanne Laferty, Preston Parker, Steve Scott, Keith Grant, Dunwel MacAllister, William Merwin, Jr., Dalton Parker, Elaine Angel, and Evalee Holloway Cagle. The return on the subpoena addressed to Mark Sherman reflects that it was served on April 9, 2018. The returns on the remaining subpoenas do not reflect that they were served. Each subpoena reflected an April 23, 2018 court date.

On April 16, 2018, the trial court entered an order granting the State's request to quash "any subpoenas for expert witnesses from the Tennessee Bureau of Investigation [(TBI)]." The order stated that after a hearing, the Petitioner "was unable to articulate a reasonable basis upon which the aforesaid [witnesses'] presence at the hearing of this matter would be required." The order stated that if the Petitioner demonstrated at the post-conviction hearing that the witnesses' testimony was needed, the court would schedule an additional hearing. The State's motion to quash the subpoenas and a hearing transcript are not included in the record, and the court's order does not identify the names of the relevant witnesses.

At the May 14, 2018 post-conviction hearing, post-conviction counsel told the post-conviction court that he issued the subpoenas on April 4, which was about forty-five days before the hearing, and that the subpoenas "were sent out" but had not been served. Counsel stated that the court had quashed the subpoenas relative to the witnesses who were TBI employees. The court stated that although it had not seen the subpoenas, TBI analysts were not necessary to resolve issues raised in the post-conviction petition. The court noted that some of the subpoenas involved jurors, and it determined that jurors could not testify at the post-conviction hearing. The court did not identify the witnesses who had been jurors. The court said that as the post-conviction hearing progressed, "if there's somebody missing, we'll try to decide whether that was critical."

Post-conviction counsel told the post-conviction court that David Ward would testify at the post-conviction hearing about new evidence, and counsel presented the court with Mr. Ward's affidavit. A subpoena bearing Mr. Ward's name is not contained in the record. The prosecutor stated that he had never seen the affidavit, and counsel explained that Mr. Ward's proposed testimony would have been that "there was an altercation prior to the occurrence in which the alleged second degree murder--." The prosecutor interrupted and stated that Preston Parker testified for the State at the Petitioner's trial and that Mr. Parker denied on cross-examination that he and the victim had an "altercation . . . a couple of weeks before" the incident in this case. The prosecutor speculated that Mr. Ward's proposed testimony would have been that Mr. Ward knew about a previous altercation involving Mr. Parker and the victim. The prosecutor stated that although Mr. Ward's proposed testimony would have

been relevant to Mr. Parker's credibility, Mr. Parker admitted at the trial that he had instigated the fight in this case and that he had pleaded guilty to second degree murder. Counsel stated that the animosity between Mr. Parker and the victim was "central" to Mr. Ward's proposed testimony but that the testimony was likewise relevant to the ineffective assistance allegations because trial counsel never served Mr. Ward with a subpoena for the trial.

The post-conviction court determined that even if Mr. Ward's proposed testimony were true, the evidence would not have changed the outcome of the trial. The court reviewed the affidavit and determined that "there's nothing in here." The court found that Mr. Ward's proposed testimony was relevant to the hatred between the victim and Mr. Parker. The court noted that the conviction offense was not premediated murder and that, as a result, the animosity between the men would not have changed the outcome of the trial. Counsel argued that if Mr. Ward had testified at the trial, the Petitioner could have challenged Mr. Parker's trial testimony and that Mr. Parker had made prior inconsistent statements. The court determined, though, that two or three additional witnesses testified at the trial about the events leading to the victim's death. Mr. Ward's affidavit is not contained in the record.

At the conclusion of the post-conviction hearing, the Petitioner requested again that the witnesses identified in the subpoenas be brought before the court to testify. The court inquired about the identity of the witnesses, and post-conviction counsel stated that the witnesses were identified in the petition. The Petitioner told the court that his petition was worthless without the witnesses. The court stated that although it would review the previous ruling, the witnesses would not have provided "significant" testimony. The court asked if the witnesses had been served with subpoenas, and counsel stated that although the return on Donald Ward's subpoena showed Mr. Ward had been served, Mr. Ward's affidavit reflected Mr. Ward had not been served. The court responded, "His credibility is pretty weak, I'm sure." Counsel told the court that "Mr. Seals" served the subpoena but had "forged" Mr. Ward's signature. The court stated that the

> Question is simply to get it back to whether or not those witnesses would have changed, in my judgment, the ultimate outcome of the trial. If there's any doubt about that, we'll give you a new trial. If there's not any doubt about it, then it wouldn't matter whether he was here or not, but should have been here. So I'm just going to go back and look at it again.

The petition for relief requested subpoenas for some of the relevant witnesses in an effort to establish the Petitioner's ineffective assistance of trial counsel allegations. The Petitioner requested that Bledsoe County Jail Administrator Paula Peterson be subpoenaed in an effort to show that counsel failed to ensure the Petitioner viewed the discovery materials contained on the compact discs and that the jail would not provide the Petitioner with means

-12-

to view the discs.  The Petitioner requested that Elaine Angel be subpoenaed in an effort to show counsel's failure to request a change of venue.  The Petitioner requested that subpoenas be issued for TBI Special Agents Mark Dunlap and Suzanne Laferty in an effort to show counsel's failure to explain why the victim's DNA was on the Petitioner's pants and counsel's "failure to ensure that the Petitioner was able to testify."  The Petitioner requested subpoenas for Preston Parker and Dalton Parker relative to their prior inconsistent statements and plea agreements in an effort to show counsel's failure to cross-examine them adequately.  The Petitioner requested a subpoena for TBI Special Agent Steve Scott in an effort to show counsel's failure to elicit testimony on cross-examination that the firearm recovered at the scene was unusable.  The Petitioner requested a subpoena for Donald Ward in an effort to show counsel's failure to call Mr. Ward as a trial witness to rebut Preston Parker's testimony in which he denied that he and the victim had been involved in an altercation two weeks before the incident in this case.  The Petitioner requested a subpoena for Evalee Holloway in an effort to show counsel's failure to interview Ms. Holloway before the trial.

The Petitioner's request for Mark Sherman to be subpoenaed was related to the Petitioner's ineffective assistance of appellate counsel in the petition.  However, no evidence was presented at the post-conviction hearing regarding appellate counsel, and the Petitioner has not asserted any claims relative to appellate counsel in this appeal.  Our review is limited to the subpoenas related to trial counsel.

The Petitioner argues generally that he was denied the opportunity to have his post-conviction claims properly adjudicated because the post-conviction court limited his ability to obtain compulsory process, but his argument focuses primarily on a subpoena he alleges was issued to David Ward.  The record does not contain a subpoena issued but not served upon Mr. Ward.  Furthermore, the hearing transcript on the State's motion to quash subpoenas and Mr. Ward's affidavit containing his proposed post-conviction testimony are not contained in the record.  The Petitioner has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal.  *See* T.R.A.P. 24; *see also State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983);.  "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue."  *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987).  Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars."  *Id*. (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).  The Petitioner has failed to prepare an adequate record, and he is not entitled to relief.

Relative to the subpoenas contained in the record, we glean from the post-conviction court's order that the decision to quash subpoenas applied only to TBI Special Agents Mark

Dunlap, Suzanne Laferty, and Steve Scott, all of whom were expert witnesses at the Petitioner's trial. The court's order does not reflect whether any of the remaining subpoenas were addressed at the motion hearing. In any event, the State's motion and the hearing transcript are not contained in the record, and we will not speculate about what occurred during the hearing. Therefore, we are precluded from considering this allegation because of an inadequate record. *Miller*, 737 S.W.2d at 558. We note that the Petitioner did not present any evidence at the post-conviction hearing establishing why the remaining subpoenas had not been served. Although the subpoenas reflect the issue date, none of the subpoenas reflect notations or explanations as to why the subpoenas were not served. Likewise, nothing in the record currently before this court reflects that these subpoenas were not served at the direction of the post-conviction court, nor does the record reflect that the Petitioner requested a continuance of the post-conviction hearing in order to serve these witnesses with subpoenas. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-14-